# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

| | | |
|---|---|---|
| SANDRA HUCKABY WATTERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 1:14-cv-0096 |
| | ) | CHIEF JUDGE CRENSHAW |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Pending before the Court is Sandra Huckaby Watters' Motion for Judgment on the Administrative Record (Doc. No. 27), to which the Social Security Administration (SSA) has responded (Doc. No 32). Plaintiff did not file a reply to the SSA's response. Upon consideration of the parties' briefs and the transcript of the administrative record (Doc. No. 19),[1] and for the reasons set forth below, Plaintiff's Motion for Judgment will be DENIED and the decision of the SSA will be AFFIRMED.

### I. Magistrate Judge Referral

In order to ensure the prompt resolution of this matter, the Court will VACATE the referral to the Magistrate Judge. (Doc. No. 4.)

### II. Introduction

Plaintiff filed an application for supplemental security income ("SSI") under Title XVI of the Social Security Act on March 6, 2012,[2] alleging disability onset as of March 14, 2011, due to

---

[1] Referenced hereinafter by "Tr." followed by the page number found in bolded typeface at the bottom right corner of the page.

[2] The Act and implementing regulations regarding Disability Insurance Benefits (contained in Title II of the Act and 20 C.F.R. Part 404 of the regulations) and SSI (contained in Title XVI of

bipolar disorder, post-traumatic stress disorder and rheumatoid arthritis. (Tr. 163.) Her claim for benefits was denied at the initial and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of her case by an Administrative Law Judge (ALJ). Plaintiff's case was heard on March 19, 2013, when she appeared with counsel and gave testimony. (Tr. 26-61.) Testimony was also received from a vocational expert. (Id.) At the conclusion of the hearing, the matter was taken under advisement until April 12, 2013, when the ALJ issued a written decision finding Plaintiff not disabled. (Tr. 19-33.) That decision contains the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since March 6, 2012, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: bronchitis, post-traumatic stress disorder, anxiety, obsessive compulsive disorder (OCD), and borderline intelligence quotient (IQ) (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 416.920(d), 416.925 and 416.926).

4. [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is limited to having occasional exposure to dust, fumes and gases. She is limited to performing simple and low level detailed tasks over a full workweek. She is able to maintain concentration, persistence, and pace long enough to perform low level detailed and simple tasks over a full workweek. She is able to have infrequent interaction with the public on a one on one basis. She is able to meet basic social demands in a work setting. She works better with objects rather than people. She is able to adapt to gradual or infrequent changes in the work place.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

---

the Act and 20 C.F.R. Part 416 of the regulations) are, substantially identical. Barnhart v. Thomas, 540 U.S. 20, 24 (2003) (noting that the Title II and the Title XVI definition of "disability" is "verbatim the same" and explaining that "[f]or simplicity sake, we will refer only to the II provisions, but our analysis applies equally to Title XVI.") The Court will cite to the regulations interchangeably.

6. The claimant was born on September 3, 1959 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7. The claimant has an eighth grade education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since March 6, 2012, the date the application was filed (20 CFR 416.920(g)).

(Tr. 21-23, 27-29.)

On May 24, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 1–6), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. Id.

### III. Review of the Record

The following summary of the medical record is taken from the ALJ's decision:

On April 6, 2011, the claimant presented to Maury County Health Department with symptoms of wheezing and shortness of breath. Treatment notes indicate she was diagnosed as having bronchitis. She was prescribed an Albuterol Inhaler for her respiratory symptoms. She was also instructed to follow up with treatment as needed. The record indicates the claimant last sought treatment for this impairment on June 19, 2012 (Exhibit 7F).

As to the claimant's mental impairments, on July 8, 2011, she presented to Maury County Health Department for a follow up visit regarding her depression and anxiety. She complained of recurring panic attacks. She also stated she experienced significant issues with anger and was unable to complete tasks. Despite all this, treatment showed improvement in the claimant's symptomology. The record indicates the claimant was doing well. No complaints were reported (Exhibits 7E, 7F pages 6 and 14).

On February 6, 2012, the claimant presented to Centerstone Community Mental Health with complaints of depression, anxiety, and a bipolar disorder. An intake assessment performed by Lesley J. Ross, M.H.S.P., a treating source, diagnosed the claimant with a bipolar disorder, generalized anxiety, post-traumatic stress disorder, and obsessive compulsive disorder. Ms. [Susan] O'Malley [LPC-MHSP] indicated the claimant's global assessment functioning (GAF) score was 50. The DSM- IV-TR (2000, p. 34) explains that GAF scores of 50 and below indicate at least "serious symptoms" from mental impairments, that would typically preclude work. It should be noted the claimant had a global assessment functioning (GAF) score of 50 at intake. While the GAF scores are an attempt to get a reading of the clinician's assessment of the patient's functioning at the time of evaluation and are useful in planning treatment, the numbers assigned are rather vague and do not readily correspond to how the Social Security Administration assesses disability in terms of severity requirements. These ratings are not part of a standardized test and are not an assessment of the claimant's mental status or limitations on his mental status (DSM- IV). Rather, they are used to track the clinical progress of an individual on global terms. These scores are not indicative of the response to treatment and medications over time. They are just one piece of data and must be considered in the context of the record as a whole to obtain a longitudinal picture of the overall degree of functional limitation based on the extent to which the impairment interferes with the ability to function independently, appropriately, effectively, and on a sustained basis. In this case, the claimant has performed routine daily activities independently and has not required regular and continuous mental health treatment during the relevant period. The claimant was prescribed Geodon, 40 mg., Prozac 10 mg., and Valium 5mg., for her mental impairments. She was instructed to follow up within one month; however, she failed to show for her scheduled appointment. The record indicates the claimant missed nine appointments between July of 2012 and February of 2013. The record further indicates the claimant only presented to six appointments within the same timeframe. Although the claimant only presented for a limited number of therapy sessions, progress notes showed improvement in the claimant's symptomology. On August 17, 2012, treatment notes indicate the claimant's medications were controlling her depression and anxiety. The record also indicates this was the last time the claimant received treatment for her mental impairments (Exhibits 8F and 11F).

As to the opinion evidence, a Mental Residual Functional Capacity Assessment dated April 9, 2012, completed by Amin Azimi, Ed. D., a State agency consultant, reported the claimant retains the ability to perform simple and detailed tasks over a full workweek. Dr. Azimi opined the claimant was able to maintain concentration, persistence, and pace long enough to perform low-level detailed tasks over a normal workday. He further opined the claimant was able to interact infrequently or have one on one interaction with the general public. He stated the claimant was able to meet the basic social demands in a work setting. Dr. Azimi concluded the claimant could adapt to gradual or infrequent changes in a workplace setting (Exhibit 4F).

Jayne Dubois, Ph.D., a State agency consultant, concurred with the assessment of Dr. Azimi dated April 9, 2012 (Exhibit 9F).

The undersigned affords the assessments of Doctors Azimi and Dubois significant weight as their opinions are consistent with the residual functional capacity and the longitudinal medical evidence.

On March 2, 2013, by referral of the claimant's attorney, she presented to a psychological evaluation, performed by Scott J. Gale, Ed. D., a one-time examining physician. Upon evaluation, the claimant indicated her bipolar disorder was well controlled. Dr. Gale administered various psychological tests including the Wechsler Adult Intelligence Scale (WAIS- IV) and the Wide Range Achievement Test (WRAT-4). Test results were used to measure the claimant's level of intellectual functioning. Test results from the (WAIS-IV) showed the claimant's full scale intelligence quotient (FSIQ) was 66. Test results from the (WRAT 4), showed the claimant's reading skills were equivalent to those of a fourth grade student. Test results also showed the claimant's spelling was equivalent to that of a third grade student. Her math skills were equivalent to those of a second grade student. Dr. Gale's diagnostic impression was bipolar disorder, anxiety disorder, not otherwise specified with spectrum of posttraumatic stress disorder, obsessive compulsive disorder, generalized anxiety disorder, personality disorder not otherwise specified with features of borderline personality disorder, mild intellectual deficiency, and orthopedic complaints. Dr. Gale opined the claimant was markedly limited in her ability to maintain attention for extended periods of two hour segments. He also stated the claimant's ability to maintain regular attendance and be punctual within customary tolerances was markedly impaired. Dr. Gale reported the claimant suffered marked restrictions in her ability to coordinate with others without being unduly distracted by them. He indicated the claimant was markedly limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Gale noted the claimant was markedly limited in her ability to accept instructions and respond appropriately to criticism from supervisors. He also reported the claimant's ability to get along with coworkers

and peers without distracting them or exhibiting behavioral extremes were marked. Dr. Gale noted the claimant was moderately limited in her ability to understand and remember short and simple instructions. Dr. Gale concluded the claimant suffered moderate limitations in her ability to make simple work related decisions (Exhibit 13F). Although Dr. Gale determined the claimant has a full scale IQ of 66; the record indicates she worked as a waitress for a number of years at substantial gainful activity (SGA) levels. According to the Dictionary of Occupational Titles, the claimant's past relevant work is considered semi-skilled. This work activity indicates the claimant is not as limited as Dr. Gale found. Even if the (IQ) scores are accurate, there is no indication for corresponding deficits in adaptive functioning. Dr. Gale is a one-time examining physician who was recommended by the claimant's attorney. His opinion is inconsistent with the longitudinal evidence of record and is not persuasive. Therefore, the undersigned affords little to no weight to the opinion of Dr. Gale.

The undersigned affords significant weight to the assessments of Doctors Azimi and Dubois because their opinions are consistent with the longitudinal evidence of record.

(Tr. 19–29.)

## IV. Conclusions of Law

### A. Standard of Review

This Court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. See Hernandez v. Comm'r of Soc.

Sec., 644 F. App'x 468, 473 (6th Cir. 2016) (citing <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." <u>Ulman v. Comm'r of Soc. Sec.</u>, 693 F.3d 709, 713 (6th Cir. 2012) (quoting <u>Bass v. McMahon</u>, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." <u>Miller</u>, 811 F.3d at 833 (quoting <u>Gentry v. Comm'r of Soc. Sec.</u>, 741 F.3d 708, 722 (6th Cir. 2014)).

## B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." <u>Id.</u> at § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011) (citing Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . .'" Kepke v. Comm'r of Soc. Sec., 636 F. App'x 625, 628 (6th Cir. 2016) (quoting Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. See Anderson v. Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010); Wright v. Massanari, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. Wright, 321 F.3d at 615–16; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA

must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony.  <u>Anderson</u>, 406 F. App'x at 35; <u>see</u> <u>Wright</u>, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  42 U.S.C. §§ 423(d)(2)(B), (5)(B); <u>Glenn v. Comm'r of Soc. Sec.</u>, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Plaintiff's Statement of Errors

Plaintiff's argues as her first claim of error that there is new, material evidence that is reasonably likely to be outcome determinative, and as a result, this action should be remanded. Defendant contends that the new evidence is not material and even if it were, Plaintiff has not demonstrated good cause for not submitting the new evidence to the ALJ.  The new evidence upon which Plaintiff relies in seeking remand is a Centerstone Disability Assessment form completed by Carolyn A. Hebel, APRN, a treating source.  Nurse Hebel's evaluation set forth her opinion regarding Plaintiff's ability to do work related activity.  (Tr. 526-28.)  Nurse Hebel's evaluation was not part of the record before the ALJ, however it was provided to the Appeals Council, which considered it before denying Plaintiff's request for review.  (Tr. 5.)

In the evaluation, Nurse Hebel opined that Plaintiff suffered from chronic post-traumatic stress disorder, generalized anxiety disorder and bipolar disorder.  (Tr. 526.)  Nurse Hebel endorsed twenty-one signs and symptoms associated with Plaintiff's diagnoses.  (<u>Id.</u>)  For example, she noted that Plaintiff had difficulty thinking or concentrating and suffered from

9

suicidal ideation or prior suicide attempts. (Id.) Under the section seeking other remarks, Nurse

Hebel stated:

> I have observed Dr. Gale's assessment and agree with his findings. [T]hey are congruent to what I see when treating Ms. Huckaby. I find that her ability to interpret information is indicative of a lower IQ by having to repeat questions or reword them in order for her to understand what I meant. I also note her ability to process information as well as retain it is low.

(Tr. 527.) Where the form sought a description of the clinical findings that demonstrate the

severity of Plaintiff's mental impairments, Nurse Hebel stated:

> mood swings, crying spells, panic attacks, difficulties falling asleep, shaking, obsessive compulsive disorder, unable to keep a job, [patient] has yelled at staff at our facility, difficultly sleeping. [Patient] currently receives therapy and medical services from us. [O]n 12/21/2012 Nurses note: Client in to see C. Hebel today for assessment. Alerted by the front desk staff that client wanted to pick up PAP medications[3] or samples today, Geodon. PAP meds have not came [sic] in yet, per the med log and per inv[estgiation].[4]

(Id.) In the section seeking a description of the Plaintiff's treatment and her response to

treatment, Nurse Hebel noted:

> [Patient] has responded well to treatment, mood, depression, anxiety, post-traumatic stress issues have improved. However patient still appears to have a lot of trouble with cognitive function (memory, information processing) and mood regulation (temper).

(Id.) Nurse Hebel noted that Plaintiff had an IQ score of 66 based on Dr. Gale's report regarding

Plaintiff's intellectual functioning. (Id.) She opined that Plaintiff's impairment or treatment

would cause Plaintiff to be absent from work at least three times a month and that alcohol or

---

[3] PAP medication appears to refer to medication obtained via a Patient Assistance Program, which helps low-income, uninsured patients get free or low-cost, brand-name medications. See Patient Assistance Programs for Prescription Drugs found at http://www.webmd.com/healthy-aging/patient-assistance-programs-for-prescription-drugs#1 (last visited Aug. 1, 2017).

[4] Although this last section appears to be incongruent with the rest of Nurse Hebel's comments, it appears to substantiate Nurse Hebel's earlier remark that Plaintiff "yelled at staff at our facility." Plaintiff was angry because her medication was not available. See Tr. 448.

substance abuse did not play a role in Plaintiff's limitations. Nurse Hebel concluded that due to mental illness, Plaintiff had moderate limitations in her activities of daily living and her interpersonal functioning and marked limitations in concentration, task performance and pace and adaptation to change. (Tr. 527-28.) Specifically, with respect to her activities of daily living, Nurse Hebel opined that Plaintiff:

> Has regular or frequent problems with performing daily routine activities and is unable to perform up to acceptable standards without frequent assistance. because [sic] of shoulder and arm injury as well as depression. [Patient] reports problems with cleaning, shopping, grooming and hygiene stating her boyfriend assists her in each activity. [5]

(Tr. 527.) With respect to interpersonal functioning, Nurse Hebel stated:

> [Patient] has been fired from a job, been told to leave the job site, [and] had altercations with several people.[6] [N]otes she has avoided going into public places due to her mood lability issues and prefers to stay home away from others[,] finds it difficult to work with others cannot tolerate criticism well from supervisors, unable to respond appropriately to changes in a work setting.

(Id.) With respect to concentration, task performance and pace, Nurse Hebel opined that:

> [Patient] has stated she cannot concentrate long enough to complete simple tasks.[7] [W]hile working states she tried to complete things perfectly causing problems in work which caused lack of time for other objectives. [S]tates she was reprimanded and was directed to take a few days off from job due to inability [to]

---

[5] Notably, Plaintiff told Dr. Gale that "she is able to attend to her own personal needs without assistance or prompting." (Tr. 501.) Additionally, Dr. Gale noted that she described in detail how she cleans her face, how she brushes her teeth, how she dresses, how she cleans her dogs' bowls, how she fixes her lunch, remembers to take her medication, does things around the house, and prepares supper. (Tr. 501.) She explained to Dr. Gale that although she does not drive, she shops for groceries, goes to doctor appointments, to pick up her medication, and visits family for special events. (Tr. 502.)

[6] According to Plaintiff's boyfriend, Courtney Belcher, she quit her last job because she could not get along with her co-workers. (Tr. 501.)

[7] During a single meeting with Dr. Gale, Plaintiff took and completed at least five psychological tests. (Tr. 499.) Although one test was invalidated, there is no suggestion in Dr. Gale's report that Plaintiff did not complete the test. (Tr. 505.) Additionally, Dr. Gale did not note that Plaintiff needed any breaks or had any difficulty completing the tests. Indeed, he opined that she "applied herself fully." (Tr. 503.)

complete tasks on the register. One place she was told she was crazy, not cut out for this type of work, and was sent home, fired. One supervisor yelled at her. [S]tates she has trouble learning new task[s].

(Tr. 528.) Finally, with respect to Plaintiff's ability to adapt to change, Nurse Hebel opined that:

[S]he has a very hard time adjusting to change as she has she becomes accustomed to everything the way it is and when changed she becomes anxious and volatile in her mood thus she exhibits exacerbations of symptoms such as trouble sleeping including increase in nightmares, hypervigilance, mood swings, anxiety attacks [,] depression and pain.

(Id.)

As noted, Nurse Hebel's evaluation was submitted to the Appeals Council, which made it part of the record, but denied review. It was not before the ALJ. After the Appeals Council denies review and the ALJ's decision becomes the final decision of the SSA, the Court, under sentence four of § 405(g), "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the SSA, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Evidence reviewed only by the Appeals Council is not part of the record in a sentence four review, which is limited to the record before the ALJ. Cline v. Comm'r of Soc. Sec., 96 F.3d 146, 148 (6th Cir. 1996); Cotton v. Sullivan, 2 F.3d 692, 695-96 (6th Cir. 1993); Wood v. Colvin, No. 13-cv-12572, 2014 WL 1377814, at *1 n.1 (E.D. Mich. Apr. 8, 2014) (affirming report & recommendation). Thus, to the extent Plaintiff seeks a sentence four remand the Court may not consider Nurse Hebel's evaluation. The Court may, however, consider evidence submitted after the ALJ's decision for the limited purpose of determining whether to remand the case for consideration of that evidence

under sentence six of § 405(g).[8] <u>Cline</u>, 96 F.3d at 148. Such remand is appropriate "when good cause exists for the failure to incorporate the new evidence into the record in a prior proceeding." <u>Graley v. Comm'r of Soc. Sec.</u>, 646 F.App'x. 414, 416 (6th Cir. 2016). In order to obtain a sentence six remand, Plaintiff must show: "(1) that the evidence is 'new' or was otherwise unavailable . . ., (2) that the evidence is 'material,' and (3) that . . . [Plaintiff] has 'good cause' for failing to submit the evidence below." <u>Glasco v. Comm'r of Soc. Sec.</u>, 645 F.App'x. 432, 435 (6th Cir. 2016) (citing <u>Hollon v. Comm'r of Soc. Sec.</u>, 447 F.3d 477, 483 (6th Cir. 2006)). "Failure to establish any one of these three elements is fatal to the moving party's request." <u>Id.</u> (citing <u>Sizemore v. Sec'y of Health & Human Servs.</u>, 865 F.2d 709, 711 n. 1 (6th Cir.1988).

"Evidence is 'new' if it did not exist at the time of the administrative proceeding[.]" <u>Johnson v. Comm'r of Soc. Sec.</u>, 535 F.App'x. 498, 509 (6th Cir. 2013). In order for new evidence to be "material," there must be a "reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." <u>Glasco</u>, 645 F.App'x. at 437 (quoting <u>Foster v. Halter</u>, 279 F.3d 348, 357 (6th Cir. 2001)). A conclusory statement that the outcome would have been different is insufficient to establish materiality. <u>Kepke v. Comm'r of Soc. Sec.</u>, 636 F.App'x. 625, 639 (6th Cir. 2016). Plaintiff can establish "'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ. <u>Foster</u>, 279 F.3d at 357 (citing <u>Willis v. Sec'y of Health & Human Servs.</u>, 727 F.2d 551, 554 (1984) (per curiam). The burden

---

[8] Under a sentence six remand, "the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding. The statute provides that following a sentence six remand, the [SSA] must return to the district court to 'file with the court any such additional or modified findings of fact and decision, and a transcript of the additional record and testimony upon which his action in modifying or affirming was based.'" <u>Melkonyan v. Sullivan</u>, 501 U.S. 89, 98(1991).

of demonstrating that remand is appropriate is on the Plaintiff. <u>Oliver v. Sec'y of Health & Human Servs.</u>, 804 F.2d 964, 966 6th Cir. 1986).

Plaintiff has failed to establish the three elements necessary for the Court to consider the new evidence. Plaintiff argues that:

> In the present case the new evidence which is Ms. Hebel's evaluation, is clearly material and was not available at the time of the hearing. There was good cause not to submit it earlier and it is outcome determinative.

(Doc. No. 31 at Page ID # 864 (citation omitted).) However, Plaintiff's recitation of the standard is insufficient to demonstrate that Nurse Hebel's evaluation satisfies the standard. Plaintiff fails to offer any reason for her failure to provide Nurse Hebel's evaluation to the ALJ at or before the hearing. What is more, Plaintiff sought, and was given, additional time, after the hearing to supplement the record with additional evidence. (Tr. 50 (requesting additional time before the record closed in order to submit additional evidence.) As Plaintiff concedes, Nurse Hebel was her treating source. The records in evidence establish that during the course of the proceedings before the SSA Plaintiff was seeing Nurse Hebel. Indeed, Plaintiff had an appointment with Nurse Hebel on April 5, 2013, less than a month after the hearing before the ALJ. Plaintiff does not suggest any reason that she could not have obtained Nurse Hebel's evaluation at that time, or at any time before, or within a reasonable amount of time after the hearing. Yet, rather than immediately supplementing the record, Plaintiff waited until September 26, 2013, more than six months after the hearing, to obtain Nurse Hebel's evaluation. Plaintiff fails to offer any cause for this delay, let alone "good cause."

Even if Plaintiff could show "good cause" however, she cannot establish materiality; that had the ALJ seen Nurse Hebel's evaluation it is reasonably likely that he would have decided Plaintiff's case differently. Nurse Hebel's evaluation was inconsistent with her treatment notes,

14

was largely based on Dr. Gale's assessment, and thus not Nurse Hebel's own experience, and substantially relied on Plaintiff's subjective complaints about her symptoms and their impacts on her life.

As noted above, in her evaluation Nurse Hebel opined that Plaintiff had moderate impairments in performing activities of daily living and interpersonal functioning and marked impairments in adapting to changes and maintaining concentration, persistence and pace. (Tr. 527-28.) Nurse Hebel also noted that Plaintiff had difficulty thinking or concentrating and that she suffered from suicidal ideation or prior suicide attempts. (Tr. 526.) However, in her treatment notes throughout the course of Plaintiff's treatment, Nurse Hebel consistently noted that Plaintiff suffered from only moderate impairments in concentration and mild impairments in attention and memory. (Tr. 399, 405, 407, 432-36, 473, 515.) Nurse Hebel also consistently noted that Plaintiff remained oriented, cooperative, calm and that her mood was euthymic. (Id.) Plaintiff exhibited appropriate affect, normal speech, logical thought processes, average intelligence and age-appropriate abstract thinking. (Id.) Moreover, despite noting in her evaluation that Plaintiff suffered from suicidal ideation, Nurse Hebel's treatment notes consistently reflected that Plaintiff did not suffer from suicidal or homicidal ideation.[9] (Id.) An ALJ may reasonably find that a medical opinion that is inconsistent with other evidence in the

---

[9] Plaintiff appears to have given inconsistent information about whether she had ever attempted suicide in the past. Plaintiff told Dr. Gale and the ALJ that she had experienced multiple hospitalizations and had attempted suicide on more than one occasion. (Tr. 44, 69, 500.) Yet, the only medical records in evidence relative to hospitalizations and suicide attempts are the records from the Middle Tennessee Mental Health Institute from a single incident in September, 2007, in which Plaintiff took five Soma pills. At the time, Plaintiff denied having suicidal ideation, was adamant that she took five Soma pills to relax (or to party) and not because she was attempting suicide. (Tr. 483, 486, 488, 490, 494, 496.) She also described an earlier episode in which she took two or three Soma pills to relax and had "a bad reaction." She again, explained that this was not a suicide attempt. (Tr. 486, 488, 490.)

record or that is internally inconsistent is unreliable.  See <u>Vorholt v. Comm'r of Soc. Sec.</u>, 409 F. App'x. 883, 887-889 (6th Cir. 2011); <u>see also</u> <u>White v. Comm'r</u>, 572 F.3d 272, 286 (6th Cir. 2009) (holding that an ALJ's finding that a medical opinion conflicts with other evidence in the record is a sufficient reason to discount the opinion); 20 C.F.R. § 404.1527(d)(4) (providing that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  Thus, even if the ALJ had received Nurse Hebel's evaluation, its internal inconsistency and its inconsistency with other evidence in the record rendered Nurse Hebel's evaluation of little meaningful use in determining the extent of Plaintiff's impairments.

Further, Nurse Hebel's evaluation is replete with entries based on Plaintiff's subjective complaints.  For example, Nurse Hebel based her assessment that Plaintiff had moderate impairments with her activities of daily living on Plaintiff's "report" that she has problems with cleaning, shopping, grooming and hygiene" because of a "shoulder and arm injury as well as depression."[10]  (Tr. 527.)  Nurse Hebel would have no way of testing the accuracy of Plaintiff's statement and nothing in Nurse Hebel's treatment notes suggested that Nurse Hebel had herself witnessed any evidence of the difficulties Plaintiff reported.  More importantly, however, Nurse Hebel was charged with determining how Plaintiff's mental illnesses would impact her activities of daily living and not the impact of her alleged physical impairments.  Likewise, Nurse Hebel notes that Plaintiff's interpersonal functioning is moderately impaired based on Plaintiff's report that she has been "fired from a job, [was] told to leave [a] job site, [and that she has] had altercations with several people."[11]  Plaintiff's subjective reporting of her experience is an

---

[10] <u>See</u> footnote 5 <u>supra.</u> for a discussion of Plaintiff's statement to Dr. Gale that she is able to attend to her own personal needs without assistance or prompting.

[11] <u>See</u> footnote 6 <u>supra.</u> for a discussion of Plaintiff's boyfriend's statement that she quit her last job.

insufficient basis for forming a medical opinion. Indeed, a medical opinion that relies on a claimant's reporting of her symptoms "is not a medical opinion at all." Francis v. Comm'r Soc. Sec. Admin, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that a physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all").

Finally, in her evaluation Nurse Hebel repeatedly cites to Dr. Gale's psychological evaluation and notes that it is "congruent" with what she has seen while treating Plaintiff. Yet, as noted above, Nurse Hebel's treatment notes paint an entirely different picture of Plaintiff. Notably, in her evaluation Nurse Hebel concurs with Dr. Gale's reporting of Plaintiff as having a low IQ or reduced intellection functioning. (Tr. 527.) However, as noted above, Nurse Hebel consistently found that Plaintiff exhibited logical thought processes, average intelligence and age-appropriate abstract thinking. (Tr. 399, 405, 407, 432-36, 473, 515.)

In sum, even if Plaintiff had demonstrated "good cause" for failing to provide Nurse Hebel's evaluation to the ALJ, the infirmities apparent in Nurse Hebel's evaluation suggest that it was unlikely to have resulted in the ALJ deciding Plaintiff's case differently. Additionally, even if the Court could consider Nurse Hebel's evaluation, based on the infirmities noted above, Nurse Hebel's opinion was not worth significant weight and would have been accorded little, if any, weight, to the extent that it did not conflict with the medical evidence of record. In sum remand under sentence six to allow the SSA to further consider Nurse Hebel's evaluation is not warranted. As will be seen, a sentence four remand is also not warranted because the Court concludes that the ALJ's decision was supported by substantial evidence.

Plaintiff argues as her second claim of error that the ALJ's decision is not supported by substantial evidence. Specifically, Plaintiff contends that the ALJ erred by failing to provide objective reasons and evidence to support his rejection of Dr. Gale's psychological evaluation

17

and for relying almost exclusively on the evaluation of Dr. Azimi, although it was based on only a small part of the record evidence. Additionally, Plaintiff claims that the ALJ erred by failing to order a mental health evaluation of Plaintiff and by failing to set forth a function by function analysis of Plaintiff's impairments in crafting his RFC assessment and failing to base his RFC assessment on the entire record.

The ALJ amply explained his reasons for according Dr. Gale's opinion "little to no weigh" and for according Dr. Azimi's opinion significant weight. (Tr. 26.) Social security regulations and rulings establish the framework for an ALJ's consideration of medical opinions. See 20 C.F.R. §§ 404.1527, 416.927; SSR 96-2p. Acceptable medical sources[12] are divided into three categories: treating sources, examining but non-treating sources, and non-examining sources. Id. A treating source "means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation" consistent with accepted medical practice, and "who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527. An examining, but "nontreating source . . . has examined the claimant but does not have, or did not have, an ongoing treatment relationship with her." Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 875 (6th Cir. 2007) (internal citation and quotation marks omitted). A "nonexamining source is a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." Id. (internal citation and quotations marks omitted).

---

[12] Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. 20 C.F.R. § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. 20 C.F.R. § 404.1513(d).

"When evaluating medical opinions, the SSA will generally give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [her]." Id. (internal citations and quotations marks omitted).  However, the SSA is only required to "give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion." Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 514 (6th Cir. 2010) (internal citation omitted).  Indeed, the Sixth Circuit has long held that the that "the regulation requiring an ALJ to provide 'good reasons' for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one non-treating source's opinion over another."  Wright v. Colvin, No. 1:15-cv-01931, 2016 WL 5661595, at *9 (N.D. Ohio Sept. 30, 2016) (citing Kornecky v. Comm'r of Soc. Sec., 167 F. App'x 496, 506-07 (6th Cir. 2006).  Likewise, the ALJ is "under no special obligation" to provide great detail as to why the opinions of the nonexamining providers "were more consistent with the overall record" than the examining, but nontreating providers.  Norris Comm'r of Soc. Sec., 461 F.App'x 433, 440 (6th Cir. 2012).  As long as "the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements. . . ." Id.

As illustrated in the record review above, after considering the medical records of evidence, the ALJ thoroughly reviewed Dr. Gale's psychological evaluation report, underscoring significant parts of the report and paraphrasing Dr. Gale's findings.  Nevertheless, the ALJ gave Dr. Gale's opinion "little to no weight" because he found it to be inconsistent with the "longitudinal evidence of record and . . . not persuasive." (Tr. 26.)  The ALJ noted that records from Centerstone consistently demonstrated that Plaintiff's symptoms were improving and her medications were controlling her depression and anxiety.  (Tr. 25.)

Moreover, as thoroughly discussed above, Dr. Gale's evaluation was inconsistent with Nurse Hebel's contemporaneous treatment notes in significant ways. Dr. Gale's evaluation was also inconsistent with Plaintiff's Centerstone treating therapist, Susan O'Malley's contemporaneous progress notes. For example, Plaintiff told O'Malley that she had a good relationship with her daughter and that they usually talk about three times per week. (Tr. 410.) By contrast, she told Dr. Gale that "she has a difficult relationship with her daughter" and that when her daughter was young, she "made some type of allegations against [Plaintiff] which resulted in [Plaintiff] temporarily losing custody [and Plaintiff's] daughter being sent to 'wilderness camps,' and attempts to help the family with home visits by multiple counselors." (Tr. 502, 500.)[13] Plaintiff told O'Malley that she completed high school, but told Dr. Gale she dropped out in the tenth grade. (Compare Tr. 438 to Tr. 500.)[14] Notably, in contrast to other evidence of record, Plaintiff told O'Malley she was unemployed but looking for work as of August 17, 2012. (Tr. 448.)

As the ALJ noted, Dr. Gale's evaluation was also inconsistent with other medical evidence in the record. For example, Plaintiff told Dr. Gale that she completed the ninth grade but dropped out of school after starting the tenth grade and that she went to cosmetology school but failed to pass the written test to become a cosmetologist. (Tr. 500.) By contrast she told the provider at the Middle Tennessee Mental Health Institute ("MTMHI") that she graduated from

[13] In her journal, Plaintiff complained that her daughter would not speak to her, would not take her calls and would hang up on her when she called. (Tr. 227, 242, 271, 282, 290.)

[14] In her Motion, Plaintiff appears to try to bolster her credibility by explaining that the many discrepancies and inconsistencies in the record are the result of a "combination of her low IQ, her extreme anxiety, and other mental conditions which often result in her being in a confused state." (Doc. No. 31 at Page ID# 878.) However, neither Nurse Hebel, Counselor O'Malley nor Dr. Gale suggested that Plaintiff appeared confused during their talks with her. Nevertheless, she does not suggest that the ALJ erred in his credibility assessment. Accordingly, the Court need not, and does not, review the ALJ's credibility assessment.

high school, attended cosmetology school and worked as a cosmetologist for a while. (Tr. 486.) Plaintiff told Dr. Gale that she had multiple hospitalizations for suicide attempts, but as discussed above, the record contains evidence for only a single hospitalization, in September, 2007, at which time, Plaintiff was adamant that she was not trying to commit suicide when she took five Soma pills. (Compare Tr. 500 to Tr. 483, 486, 488, 490, 494, 496; see also footnote 9.) Additionally, although Plaintiff told the MTMHI provider that she had never been abused as a child and denied that she had any family history of psychiatric disorders. To Dr. Gale, Plaintiff described having been subject to horrible abuse as a child, and her PTSD diagnosis appears to be primarily based on her childhood abuse, and she noted that her daughter has significant mental health issues. (Compare Tr. 486 to 503.)[15] As with Nurse Hebel's evaluation, because Dr. Gale's evaluation was inconsistent with the record evidence and based largely on Plaintiff's subject reporting of her complaints, it was not due significant weight. The ALJ made sufficiently clear the reasons he did not accord significant weight to Dr. Gale's psychological evaluation. The ALJ did not err in this assessment.

With respect to Plaintiff's claim that the ALJ erred by giving Dr. Azimi's opinion significant weight, this claim is likewise unavailing. As fully set forth in the record review above, the ALJ reviewed the documents submitted by Dr. Azimi; a Psychiatric Review Technique form ("PRTF") and a Mental Residual Functional Capacity Assessment ("MRFC"). (Tr. 348-61, 362-64.) He also reviewed the Case Analysis prepared by Jayne DuBois, Ph.D., which, after independently reviewing the evidence, affirmed Dr. Azimi's findings. (Tr. 430.)

---

[15] She also told the ALJ that her daughter suffers from significant mental health issues, that she has two brothers both of whom are cognitively delayed and that she suffered terrible abuse at the hands of her alcoholic father. (Tr. 45, 51, 69, 70.)

After conducting this review, the ALJ concluded that Dr. Azimi's findings were consistent with the evidence of record. He did not err in coming to this conclusion.

Relying on record evidence, and consistent with Plaintiff's statements to health care providers and her testimony at the hearing, Dr. Azimi noted that Plaintiff had a ninth grade education and alleged bipolar disorder and PTSD as limiting conditions. (Tr. 360.) He noted that the results of the mental status exams conducted by Nurse Hebel at each of Plaintiff's appointments, and described in full above, reflected that Plaintiff was oriented, organized, possessing a logical thought process, having an appropriate affect, euthymic mood and denying suicidal or homicidal ideation. (Id.; see also Tr.399, 405, 407, 432-36, 473. 515.) In his MRFC, Dr. Azimi noted that Plaintiff had moderate limitations in her ability to understand and remember detailed instructions, in her ability to carry out detailed instructions and maintain attention and concentration, her ability to sustain concentration and complete a normal workday, her ability to interact appropriately with the public and her ability to respond appropriately to changes in the work setting. (Tr. 362-63.) These findings were more restrictive than Nurse Hebel's treatment notes, alone, would have supported; Nurse Hebel having consistently found Plaintiff to have only mild limitations with respect to attention and memory, but consistent with Nurse Hebel's finding that Plaintiff's ability to concentrate was moderately impaired. (Tr. 399, 405, 407, 432-36, 473, 515.)

Plaintiff describes eight items of evidence that Dr. Azimi did not review: (1) the report of a state agency consultative examiner who conducted Plaintiff's physical examination suggesting that a mental health evaluation should be conducted; (2) Centerstone records showing the additional diagnosis of generalized anxiety disorder; (3) Centerstone records showing the

additional diagnosis of obsessive compulsive disorder;[16] (4) Plaintiff's records from her September, 2007 MTMHI hospitalization; (5) records from a June, 2012 drug overdose; (6) Dr. Gale's mental health evaluation; (7) Dr. Gale's finding that Plaintiff had an IQ of 66; (8) Plaintiff's personal journal.[17] However, she fails to suggest how review of these documents would have changed Dr. Azimi's findings or MRFC. Had he reviewed it, Dr. Azimi could reasonably have concluded that Dr. Gale's evaluation was due little to no weight because of the infirmities fully described above. Likewise, had he reviewed Plaintiff's journal, he could reasonably have found it uninfluential because it contained only Plaintiff's subjective complaints and was, apparently, created for the express purpose of bolstering her disability claim. (See Tr. 105 (appointment of representative on November 7, 2012, Tr. 226 (start of journal November 7, 2012, 6:00 p.m.) Plaintiff fails to explain how the various additional diagnoses she received after Dr. Azimi reviewed her records would have changed the results of Dr. Azimi's PRTF or MRFC. The mere fact that Plaintiff has a diagnosis or diagnoses does not mean that she has a disabling limitation because a diagnosis, in and of itself, "says nothing about the severity of the condition." Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988). Plaintiff contends Dr. Azimi never saw her records from her September, 2007 hospitalization at MTMHI and that he never saw "her records when she had a drug overdose in early June of 2012 and was rushed by ambulance to the hospital

---

[16] Plaintiff also notes that Dr. Azimi did not see the record of her "emotional melt down" at Centerstone when medication she was expecting to pick up was not available. However, Plaintiff does not suggest how this single incident would have changed Dr. Azimi's findings.
[17] Plaintiff also suggests that the ALJ did not review her journal because he did not mention it in the decision. However, merely failing to mention the journal does not establish that the ALJ did not consider it. See Thacker v. Comm'r of Soc. Sec., 99 F. App'x 661, 665 (6th Cir. 2004) (recognizing that "ALJ need not discuss every piece of evidence in the record for his [or her] decision to stand.") Moreover, at the hearing the ALJ mentioned having read about Plaintiff's childhood experience of seeing her father try to break into the house using an axe, an event mentioned in her journal. (See Tr. 45, 232.)

23

but denied being suicidal." (Doc. No. 31 at Page ID# 871.) Plaintiff's hospitalization at MTMHI took place long before the date upon which she alleges her disability began, thus these records were unlikely to have persuaded Dr. Azimi that his MRFC required modification. See Melius v. Colvin, No. CV 15–10820, 2016 WL 633953, at *4 (E.D. Mich. Feb. 9, 2016), report and recommendation adopted sub nom. Melius v. Comm'r of Soc. Sec., No. 15–CV–10820, 2016 WL 1104467 (E.D. Mich. Mar. 22, 2016) (noting the limited relevance of records that predate an alleged onset date). As to Plaintiff's suggestion that the ALJ could not reasonably rely on Dr. Azimi's opinion because Dr. Azimi did not see records from "when she had a drug overdose in early June of 2012 and was rushed by ambulance to the hospital but denied being suicidal," (Doc. 31 at Page ID# 871), Plaintiff vastly overstates the nature of the "records" she believes would have changed Dr. Azimi's findings. There were no medical records in evidence from this alleged event. The only reference to this event, and the "record" the Plaintiff cites in support of this contention, is Counselor O'Malley's progress note from a visit with Plaintiff on June 8, 2012, in which Counselor O'Malley notes that Plaintiff "reports she was taken by ambulance to MRH a week ago after she tried to OD, says she didn't really want to die but just wanted the feelings of hurt to go away." (Tr. 396.)[18] Assuming that this event actually took place,[19] Plaintiff does not suggest how merely knowing that Plaintiff tried to overdose, but was not attempting to commit suicide, without more, would have altered Dr. Azimi's findings.

---

[18] Plaintiff also cites to one-page mental and physical health case analyses. (Tr. 430-31.) The mental health case analysis merely parrots Counselor O'Malley's notes and is not itself evidence of the alleged event. The physical health case analysis fails to mention this event.

[19] In addition to the absence of medical records relative to this incident, the fact that Plaintiff sought reconsideration of the SSA's original denial of her claim for SSI on June 22, 2012, but did not mention any drug overdoses and indeed stated "I have no additional evidence to submit," undermines, at best, the impact of this alleged incident.

Lastly, Plaintiff's claims that Dr. Azimi's findings were inherently unreliable because he made them without first having reviewed Dr. Gale's evaluation or Plaintiff's journal. For all the reasons set forth above explaining why the ALJ did not err by failing to give more weight to Dr. Gale's evaluation, the impact of Dr. Gale's report on Dr. Azimi's findings would have been insubstantial. Likewise, as set forth above, the impact of Plaintiff's journal, setting forth her subjective complaints, apparently for the purposes of establishing disability, is unlikely to have swayed Dr. Azimi to modify his findings.

Plaintiff next claims that the ALJ erred by failing to order a mental health evaluation as recommended by Robert Loy Whittaker, MD, a state agency provider who conducted a consultative physical examination of Plaintiff on April 21, 2012. (Tr. 366-69.) Dr. Whittaker found that Plaintiff had "a mild level of limitation in job-related activities when looking at the physical aspect" and "no level of limitation in activities of daily living . . . ." (Tr. 368.) Dr. Whittaker suggested that Plaintiff undergo a mental health evaluation "as her main complaint for being unable to work is her anxiety and panic attacks." (Id.)

Whether to obtain a consultative evaluation is within the ALJ's discretion. See 20 C.F.R. § 416.919. The ALJ "may" purchase a consultative evaluation "if [the SSA] cannot get the information [it] needs from [the plaintiff's] medical sources." See 20 C.F.R. § 416.919a(a). "Before purchasing a consultative examination, [the SSA] will consider not only existing medical reports, but also the disability interview form containing [the plaintiff's] allegations as well as other pertinent evidence in [the plaintiff's] file." Id. The SSA may purchase a consultative examination:

> to try to resolve an inconsistency in the evidence or when the evidence as a whole
> is insufficient to support a determination or decision on [the plaintiff's] claim.
> Some examples of when [the SSA] might purchase a consultative examination to

secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis, include but are not limited to:

(1) The additional evidence needed is not contained in the records of [the plaintiff's] medical sources;

(2) The evidence that may have been available from [the plaintiff's] treating or other medical sources cannot be obtained for reasons beyond [the plaintiff's] control, such as death or noncooperation of a medical source;

(3) Highly technical or specialized medical evidence that [the SSA] need[s] is not available from [the plaintiff's] treating or other medical sources; or

(4) There is an indication of a change in [the plaintiff's] condition that is likely to affect [the plaintiff's] ability to work . . ., but the current severity of [the plaintiff's] impairment is not established.

20 C.F.R. § 416.919a(b). Here, the ALJ had medical and mental health records from Plaintiff's medical sources. (Tr. 328-31, 332-47, 432-82, 483-97.) He had a number of documents related to Plaintiff's initial disability application, many of which were prepared by Plaintiff, and her appeal of the initial denial of her claim. (Tr. 144-88, 193-206, 211-24).) He had Plaintiff's personal journal. (Tr. 225-303.) The ALJ also had a variety of documents generated by state agency personnel or providers including: two Vocational Analysis Worksheets, (Tr. 189-92, 207-10); the PRTF and MRFC prepared by Dr. Azimi (Tr. 348-65); the consultative examination conducted by Dr. Whittaker (366-70); and three medical evaluations/case analyses. (Tr. 371-75, 430-31). Lastly, he had the psychological evaluation prepared by Dr. Gale. (Tr. 498-508.) Plainly, the ALJ did not find that he needed additional evidence "to try to resolve an inconsistency in the evidence" nor did he find that "the evidence as a whole [was] insufficient to support a . . . decision on [the plaintiff's] claim. 20 C.F.R. § 416.919. Without such a finding, the ALJ was under no obligation to obtain an additional consultative examination.

Finally, Plaintiff contends that the ALJ erred by failing to perform a function-by-function assessment of her RFC as required by SSR 96-8p, 1996 WL 374184 (July 2, 19976).  To be sure, SSR 96–8p mandates that the ALJ "individually assess the exertional (lifting, carrying, standing, walking, sitting, pushing, and pulling), and non-exertional (manipulative, postural, visual, communicative, and mental functions) capacities of the claimant in determining a claimant's RFC."  Delgado v. Comm'r of Soc. Sec., 30 F. App'x 542, 547 (6th Cir. 2002).  However, case law does not require the ALJ to discuss those capacities for which no limitation is alleged. See id. (listing cases).  The ALJ fully specified Plaintiff's exertional and nonexertional limitations in his RFC.  As noted above, the ALJ found, based on the evidence in the record, that Plaintiff could perform a full range of work at all exertional levels.  The ALJ further found that certain non-exertional limitations applied to Plaintiff, including; that she be exposed only occasionally to dust, fumes and gases; that she be charged with performing only simple and low-level detailed tasks; that she have infrequent interaction with the public on a one-on-one basis; that she would work better with objects than with people and the she be required to adapt to only gradual or infrequent changes in the work place.  (Tr. 23.)  The ALJ sufficiently complied with the requirements of 96-8p.

In sum, Plaintiff's claims of error have no merit, and the decision of the ALJ is supported by substantial evidence on the record as a whole.  Accordingly, the ALJ's decision will be affirmed.

## V.  Conclusion

In light of the foregoing, Plaintiff's Motion for Judgment on the Administrative Record will be DENIED and the decision of the SSA will be AFFIRMED.

An appropriate order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE